# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Estate of H.B.*, 2012 IL App (3d) 120475

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF H.B., a Minor (Maria B. and Darrell B., Petitioners-Appellees, v. Courtney B., Respondent-Appellant). |
| District & No. | Third District<br>Docket No. 3-12-0475 |
| Filed<br>Modified | November 28, 2012<br>March 14, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The orders for the "temporary" guardianship of petitioner's granddaughter to petitioner and joint guardianship to petitioner and her husband were reversed and vacated, since no finding was made as to petitioner's standing to proceed on the first petition and there was no finding on the child's best interest with regard to the second petition, but the appellate court retained jurisdiction and remanded the cause to allow the trial court to make the necessary findings and rule on the second petition before giving the appellate court an opportunity to address the remaining issues. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 10-P-875; the Hon. Paula A. Gomora, Judge, presiding. |
| Judgment | Reversed in part and vacated in part. |

| Counsel on Appeal | Pamela Davis Gorcowski, of Kavanagh Grumley & Gorbold LLC, of Joliet, for appellant. |
|---|---|
| | Timothy A. Clark, of Krockey, Cernugel, Cowgill & Clark, Ltd., of Joliet, for appellees. |
| | Judy A. Goldstein, of Mokena, guardian *ad litem.* |
| Panel | JUSTICE WRIGHT delivered the judgment of the court, with opinion. Justices McDade and O'Brien concurred in the judgment and opinion. |

## OPINION

¶ 1    Courtney B. (Courtney), mother of the minor H.B., appeals the trial court's order of November 19, 2010, awarding "temporary" guardianship of H.B. to Maria B. (Maria), H.B.'s maternal grandmother, without Courtney's consent, pursuant to the Probate Act of 1975 (755 ILCS 5/1-1 *et seq.* (West 2010)) (the Probate Act). She also appeals the order of March 2, 2012, granting the maternal grandparents, Maria and Darrell B. (Darrell), joint guardianship of H.B. over Courtney's objection, also under the Probate Act. For the reasons that follow, we reverse the 2010 order and vacate the 2012 order.

¶ 2                                FACTS

¶ 3    Courtney B. is the mother of the minor H.B., who was born out of wedlock on April 25, 2005. Mitchell T. is the biological father of H.B., and, according to the record in this case, he exercised his right to visit H.B. every other weekend. Maria and Darrell are H.B.'s maternal grandparents.

¶ 4    On November 16, 2010, Maria filed a petition for guardianship titled "Emergency Petition for the Appointment of Temporary Guardian" (the first petition) pursuant to section 11-8 of the Probate Act. 755 ILCS 5/11-8 (West 2010). The first petition alleged Courtney was incapable of caring for H.B. and requested guardianship of H.B. on a short-term basis. The first petition stated that, in October 2010, Courtney forced H.B. to engage in the "cinnamon challenge" by having H.B., age five at the time, swallow a teaspoon of cinnamon, causing H.B. to gag and vomit. The petition further alleged that this matter was an emergency because, without court intervention, Courtney could remove H.B. from her grandparents' "possession" and "custody." The petition claimed it would be in the "best interest" of H.B. to "protect the minor from her mother."

¶ 5    On the same date, November 16, 2010, Maria and Darrell simultaneously filed a separate

joint petition for guardianship (the second petition). The second petition was signed only by Maria and did not refer to the cinnamon challenge, but it generally alleged that the grandparents had "custody" of H.B. The second petition also contended Courtney had a history of mental illness and was abusive and neglectful toward H.B. In addition, the second petition alleged H.B.'s father had inadequate housing and that the environment was unsuitable for H.B. The second petition also claimed the grandparents had been H.B.'s primary caretakers during her life and requested guardianship of H.B. on a more permanent basis.

¶ 6        The grandparents filed a proof of service with the court indicating both the first and second guardianship petitions were mailed to Courtney on November 16, 2010, by regular mail. It is unclear from the record whether Courtney received actual notice of the emergency proceedings scheduled for November 19, 2010. The first order entered on November 19, 2010, indicated notice to Courtney was both "given" and "waived."

¶ 7        On November 19, 2010, the record shows Courtney was not present in court, but Maria was present and represented by counsel. On that date, the court appointed a guardian *ad litem* (GAL), who was also present in court. The GAL recommended to the court that, based on the video of the cinnamon challenge, "[t]emporary [g]uardianship" of H.B. should be granted to Maria. The court did not receive the sworn testimony of any witness on this date, and the court did not watch the video recording of the cinnamon challenge. Without addressing the issue of standing or the best interest of the minor, the trial court followed the GAL's recommendation and the court awarded "temporary" guardianship to Maria on November 19, 2010.

¶ 8        The first order of guardianship restricted Courtney's contact with her biological daughter to supervised visitation and prohibited Pablo Rivera (Pablo), Courtney's alleged paramour, from having any contact with H.B. The court set the matter for a hearing on the second petition for guardianship to take place two months later, on January 21, 2011.

¶ 9        Five days later, on November 24, 2010, Courtney, appearing *pro se*, answered both petitions for guardianship in writing. Her answer to the petitions asserted she was both willing and able to provide for H.B., and she denied abusing or neglecting H.B. In addition, Courtney asked the court to immediately return H.B. to Courtney's custody and schedule the hearing on the second petition for joint guardianship in an expedited manner.

¶ 10       On December 1, 2010, after the parties appeared in court, the court denied Courtney's written request for an expedited hearing. The trial court did not set aside the November 19, 2010, order as Courtney requested. The hearing on the second petition for guardianship did not occur on January 21, 2011, as originally scheduled, but began approximately one year later, on September 23, 2011.[1]

¶ 11       On September 23, 2011, Maria testified before the court for the first time. She testified that she initially had no concerns about Courtney's ability to take care of H.B. from the date of H.B.'s birth in 2005 until approximately September 2006, when Maria would help H.B.

---

[1]Multiple continuances were allowed due to an ongoing investigation by the Department of Children and Family Services (DCFS), and a possible criminal investigation involving Courtney.

get ready for day care in the morning. In May 2007, Courtney took family leave from her job at Argonne National Laboratory for mental health reasons. Thereafter, Courtney married Paul Hodges (Paul) in September 2007. Paul was not the biological father of H.B. According to Maria, Paul approached Maria to express his concern that Courtney was spending too much time online and was not spending her time caring for H.B. Maria indicated that Courtney was hospitalized in 2007 for taking more than 20 Xanax pills, and in 2008 and 2009 for psychiatric problems. Courtney was eventually diagnosed with bipolar disorder.

¶ 12    According to Maria, from early 2008 to early 2010, Courtney, Courtney's maternal aunt and uncle, Vivian Kay Johnson (Kay)[2] and George Lawhorn, together with H.B.'s maternal grandparents all shared the responsibility of caring for H.B. During this time frame, Maria described Courtney's home as unclean. When asked why she allowed H.B. to stay with Courtney without first contacting DCFS, Maria replied she did not want "to involve DCFS because we feared that [H.B.] would be taken and put with someone else. And as long as we could manipulate the situation to where that [*sic*] [H.B.] was safe and with her family, that's what we did."

¶ 13    Maria explained that in April 2010, Courtney executed a form allowing Maria to exercise short-term guardianship of H.B. for educational purposes. This decision allowed H.B. to attend the elementary school in her maternal grandparents' school district. However, Courtney informed Maria that she still wanted to have H.B. whenever she wanted her, and she wanted to be H.B.'s mother.

¶ 14    Courtney and Paul divorced in June 2010. That same month, Courtney moved out of the home she shared with Paul and moved in with Pablo. Courtney showed Maria the video of the cinnamon challenge on October 10, 2010. A month later, on November 16, 2010, Maria filed an "Emergency Petition for the Appointment of Temporary Guardian" under the Probate Act, and both maternal grandparents filed a second, but joint, petition seeking guardianship on a more permanent basis.

¶ 15    According to Maria's testimony, after Courtney received the first court order by mail, Courtney called the police, and requested the police to arrest the grandparents for kidnapping H.B. Maria explained that, instead, the police charged Courtney with child endangerment based on the video of the cinnamon challenge. The police also notified DCFS of the cinnamon challenge. Following an investigation, DCFS made a preliminary finding of abuse or neglect against Courtney.[3] After a bench trial, Courtney was found not guilty of endangering the life or health of a child on January 12, 2012.

---

[2]The GAL's report in this case refers to Courtney's maternal aunt and uncle as "KAY and GEORGE Lawhorn." However, Courtney's maternal aunt testified in these proceedings and identified herself to the court as "Vivian Kay Johnson."

[3]Courtney claimed she had records from DCFS indicating that no further services were needed. It appears Courtney, acting *pro se*, was unable to admit those documents into evidence because they were not certified and no one from DCFS was available to testify to lay a foundation for the records as business records.

¶ 16 Maria stated that she had "made every effort" to make sure that Courtney was able to visit with H.B. On average, Courtney visited H.B. twice a week, for an hour and a half at a time. However, Maria admitted that sometimes she was unavailable and the visits did not take place.

¶ 17 During Maria's testimony, the court asked the grandparents' attorney what section of the Probate Act applied to their request for guardianship. The grandparents' attorney argued that guardianship provisions in the Probate Act existed, in part, so the State would not become involved. The following exchange occurred between the court and the grandparents' attorney:

"MS. GAVLIN [Grandparents' attorney]: I'm–here we have, Judge a temporary guardianship that's been in effect that mother is seeking to terminate the temporary guardianship, and it is–obviously the Court has to weigh superior rights and best interests, and there is [*sic*] factors that are set forth in 14–in 5/11-14.1.

But in looking at that statute and looking at the purpose of why that statute is there is so that the [S]tate doesn't get involved. So that we have a family relationship where we have a non parent with the ability to take care of the parent [*sic*] if a parent, in fact, is either unable, unwilling to take care. So that not everything goes through the [S]tate. I think the statute is there for a reason.

THE COURT: The downside is, and just so everyone is aware while we are discussing–we are still on the record. The downside to that is, and this is just me thinking out loud, and while, you know, anyone says DCFS, and everybody just goes into a complete panic, and that's maybe only a half truth. The downside is is [*sic*] that if, in fact, I were to make a decision that, you know, guardianship would be in order, that anything that would–as far as services were concerned to help parent or parents become better parents or to get their life in order will not be provided if there is no insurance. The upside to DCFS is [S]tate involvement and having those services be paid for."

After this exchange, the trial court continued to express concerns regarding the statutory provisions supporting the request for guardianship under the Probate Act. The grandparents' attorney responded:

"MS. GAVLIN: So I think the Court just has to make a finding whether or not she's ready, willing and able to be able to take care of this child. And based on that, the Court can look at a lot of factors here. And then at the same time if the Court finds that she's, you know, willing, but perhaps not able or not capable, the Court can grant the petition for guardianship.

If the Court says, well, she is ready willing and able, she is a parent, the Court then has to weigh best interests of this minor child as well."

After Maria's testimony, the grandparents called Courtney's ex-husband (Paul), Courtney's maternal aunt (Kay), Courtney's neighbor, and one of Courtney's sisters, who all offered testimony consistent with Maria's version of events regarding Courtney's inability to care for H.B.

¶ 18 The GAL was called as a witness for the grandparents on October 5, 2011. According to the GAL's report, the biological father, Mitchell T., believed H.B. should be with Courtney

"as long as [Courtney] is cleaning herself up and looking for a job." The GAL recommended the court allow the grandparents' petition for guardianship because, in her opinion, Courtney was unable to provide day-to-day care for H.B.

¶ 19    On that date, Courtney was also called as an adverse witness. Courtney claimed she was not in a relationship with Pablo, but agreed she lived in a duplex with Pablo and worked as a nanny for his daughter, Isabella. She also had a part-time job staining, finishing, and sanding woodwork and cabinetry, for which she was paid $20 an hour.

¶ 20    Courtney testified that she weaned herself off of several prescription drugs, and she only currently took Xanax, for anxiety, and Norco, for endometriosis. She explained that letting H.B. participate in the cinnamon challenge was a lapse in judgment, but she never intended to harm her daughter. She and Pablo had both done the cinnamon challenge, and she did not contemplate that H.B. would choke on the cinnamon. Following Courtney's testimony, the grandparents rested. The matter was continued to February 3, 2012, for further evidence.

¶ 21    On February 3, 2012, Courtney, proceeding *pro se*, called Pablo as her first witness. Pablo testified that Courtney was now his wife and provided day-to-day care for his daughter, Isabella, to his satisfaction. He further stated he was a "neat freak" so their home was always clean. He testified that Courtney's mental state had significantly improved since her divorce from Paul.

¶ 22    Courtney also testified on her own behalf when the hearing continued on February 3, 2012. Courtney stated that she loves her daughter and wants to be her parent. Courtney described occasions when she wanted to exercise visitation with H.B., but could not do so because Maria was unavailable and out to dinner with friends.

¶ 23    On March 2, 2012, the parties appeared in court for closing arguments. However, before the arguments began, the grandparents' attorney informed the court that Courtney filed for an order of protection against Pablo in early February 2012. In response, Courtney advised the court that the order of protection was dismissed and the couple was ordered to attend marriage counseling. The court agreed to take judicial notice of the order of protection documents, marked as "GAL's Exhibit Number 1."

¶ 24    Before reaching a decision, the court encouraged the grandparents to consider whether they wanted to proceed on their joint petition for guardianship. The court advised the grandparents that if they did not want to "parent" their granddaughter, the court could return H.B. to Courtney, with DCFS providing services. The grandparents declined and the court then granted the grandparents' petition for guardianship by stating:

> "Courtney, I am going to grant your parents the plenary guardianship that they are seeking. There are some things that you need to do. I find that you are–I understand that you are willing, although I do not believe even able at this particular point to assume the parental role over your daughter given the fact that you have issues within your life, particularly domestic violence."

The court made no other factual findings and entered a written order granting guardianship to the grandparents, terminating on H.B.'s eighteenth birthday on April 25, 2023. The court did not address whether Courtney would continue to receive supervised visitation with H.B. Courtney appeals.

-6-

¶ 25                                ANALYSIS

¶ 26               I. First Order of Guardianship Entered on November 19, 2010

¶ 27    On appeal, Courtney argues the trial court erred by granting Maria's "Emergency Petition for the Appointment of Temporary Guardian" on November 19, 2010. The grandparents respond that, if error occurred, it was harmless because Courtney executed a written form giving Maria short-term guardianship over H.B. on March 31, 2010, for the purpose of allowing H.B. to attend a school in the grandparents' district.

¶ 28    Initially we note that the trial court referred to the grandparents' petition as a request for "plenary guardianship," and entered an order appointing the grandparents as "[p]lenary" guardians. Similarly, in their appellate briefs, the parties refer to the individual petitions for guardianship as the "temporary" petition for guardianship and the "plenary" petition for guardianship. The language "temporary" and "plenary," as employed by the trial court and the parties, is potentially confusing because these terms are used in the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 *et seq.* (West 2010)) with reference to orders of protection, rather than orders of guardianship. Therefore, for purposes of clarity, we abandon the terms "temporary" and "plenary" and refer to the order of November 19, 2010, as the "first order of guardianship." Similarly, the order dated March 2, 2012, will be referred to as the "second order of guardianship."

¶ 29    In this case, Maria filed the "Emergency Petition for the Appointment of Temporary Guardian" on November 16, 2010, approximately one month after viewing the video recording of the cinnamon challenge. This first petition was filed pursuant to the Probate Act and requested the court place H.B. under the guardianship of a nonparent on an "emergency" basis due to events depicted in the cinnamon challenge, Courtney's mental instability, and the risk that Courtney might elect to remove H.B. from her grandparents' care.

¶ 30    However, after carefully reviewing the Probate Act, we are unable to find any provisions allowing a court to enter an order for "emergency" or "temporary" guardianship of a child pursuant to section 11-8 of the Probate Act, contrary to wishes of a biological parent.[4] Instead, an emergency request to remove a child from the care of a biological parent, such as that presented by the first petition in this case, may be addressed using the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2010)) (Juvenile Court Act), which is specifically designed to address such urgent situations.

¶ 31    Under the Juvenile Court Act, children at risk of harm arising out of abuse and neglect can be removed from a parent's care on a temporary basis pursuant to an emergency shelter care hearing. See 705 ILCS 405/2-10 (West 2010). The Probate Act does not provide for a similar emergency procedure to remove a minor from a living parent's care or custody without a parent's express written consent to guardianship.

¶ 32    In this case, Maria admitted that she attempted to "manipulate the situation" rather than

_____

[4]The only provision of the Probate Act that allows for an order of temporary guardianship applies to disabled adults, not children with living biological parents. 755 ILCS 5/11a-4 (West 2010). Specifically, even section 11a-4 provides for temporary guardianship of a disabled adult under very limited circumstances, obviously not applicable to the case at bar. 755 ILCS 5/11a-4 (West 2010).

risk that the court might allow DCFS to place H.B. with someone else. Maria's decision to avoid the Juvenile Court Act and to petition for guardianship under the Probate Act, without a biological parent's consent, is problematic to us because this approach did not allow Courtney to request the trial court to provide her with a court-appointed attorney pursuant to the Juvenile Court Act. 705 ILCS 405/1-5(1) (West 2010). In addition, as carefully noted by the trial court, this approach also prevented the court from requiring Courtney to complete court-ordered programs designed to improve her parenting skills under the authority of the Juvenile Court Act. Finally, the second order of guardianship removed H.B. from Courtney's care until H.B. reached the age of 18, which deprived Courtney of her right, as a biological parent, to make and carry out the day-to-day child care decisions concerning her daughter.

¶ 33    Clearly, Maria's decision to proceed under the Probate Act controls our analytical approach on appeal. The Probate Act allows the court to appoint a nonparent as a guardian of a minor in two very limited situations. First, the court has the authority to enter an order of guardianship based on the parent's decision to designate, in writing, a guardian, successor guardian, stand-by guardian, or short-term guardian of a minor. 755 ILCS 5/11-5(a-1), 11-5.3, 11-5.4 (West 2010). The Probate Act provides stringent requirements for this written designation, which must be witnessed by two credible witnesses over the age of 18 and must be approved by the other nonappointing parent, if also wiling and able to make the day-to-day decisions regarding child care. 755 ILCS 5/11-5(a-1), 11-5.3, 11-5.4 (West 2010). Interestingly, the grandparents do not question or challenge whether Courtney was "able" to execute a short-term consent for Maria to exercise guardianship over H.B. on March 31, 2010.

¶ 34    Second, in situations where the custodial parent is living and has not completed a written designation of guardianship that complies with the Probate Act, the Act allows the court to appoint a nonparent as a guardian of a minor only *after* the court finds the biological parent or parents are not willing or able to make and carry out the day-to-day child care decisions for their child. 755 ILCS 5/11-5(b) (West 2010). Specifically, section 11-5(b) of the Probate Act provides in pertinent part:

> "(b) The court lacks jurisdiction to proceed on a petition for the appointment of a guardian of a minor if it finds that (I) the minor has a living parent, adoptive parent or adjudicated parent, whose parental rights have not been terminated, whose whereabouts are known, and who is willing and able to make and carry out day-to-day child care decisions concerning the minor ***. *** There shall be a rebuttable presumption that a parent of a minor is willing and able to make and carry out day-to-day child care decisions concerning the minor, but the presumption may be rebutted by a preponderance of the evidence." 755 ILCS 5/11-5(b) (West 2010).

¶ 35    With respect to the "Emergency Petition for the Appointment of Temporary Guardian," filed by Maria, Maria's attorney did not offer any evidence concerning H.B.'s best interest, nor did counsel attempt to rebut the statutory presumption under section 11-5(b) that Courtney was both willing and able to carry out day-to-day child care decisions concerning H.B. Further, the trial court did not make any finding regarding H.B.'s father's willingness or ability to make the day-to-day child care decisions concerning H.B. as required by section 11-5(b) of the Probate Act before entering the first order of guardianship. 755 ILCS 5/11-5(b)

(West 2010).

¶ 36 Consequently, we conclude the trial court erred by granting Maria's "Emergency Petition for the Appointment of Temporary Guardian" on two grounds. First, there are no explicit provisions in the Probate Act providing for an "emergency petition" for guardianship. Second, the trial court could not grant the first petition without first making a threshold determination, as required by section 11-5, that guardianship was in H.B.'s best interest *and* that Maria had rebutted the presumption that Courtney was willing and able to make the day-to-day care decisions for her daughter. 755 ILCS 5/11-5(a), (b) (West 2010).

¶ 37 The grandparents respond that, even if error occurred, it was harmless because Courtney allowed Maria to act as the short-term guardian of H.B. by granting Maria short-term guardianship on March 31, 2010, which allowed H.B. to reside at her grandparent's address in order to attend school in the grandparents' district. See 755 ILCS 5/11-5.4 (West 2010). This argument fails for several reasons. First, although the grandparents introduced the purported written consent form into evidence during Courtney's testimony before the trial court in 2011, the original exhibit, marked as "Exhibit 14," has not been provided to this court as part of the record on appeal to date, and therefore we may not consider it. *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 14 (2009) ("[a]n appellate court may not consider documents that are not part of the certified record on appeal"). Second, Courtney's purported written consent form was not presented to the court or asserted as the basis for the first petition for "temporary" guardianship that the court allowed on November 19, 2010. Thus, the trial court did not make any findings regarding whether the short-term written consent form was properly witnessed by two individuals, contained the consent of H.B.'s other living but nonappointing parent, and met the other stringent requirements of the Probate Act. 755 ILCS 5/11-5.4 (West 2010). Third, the grandparents admit that the short-term guardianship arrangements Courtney made with Maria, in March 2010, would have expired 365 days later, pursuant to statute, on March 31, 2011. 755 ILCS 5/11-5.4(c) (West 2010). In this case, the first order of guardianship was effective for another year beyond that date, until March 2, 2012. At the very least, we conclude the errors leading to the November 19, 2010, order of guardianship cannot be deemed harmless. Accordingly, we reverse the first order of guardianship entered by the court on November 19, 2010, which was effective until March 2, 2012.

¶ 38 II. Second Order of Guardianship Entered on March 2, 2012

¶ 39 Next, Courtney argues the trial court should not have considered the second petition for guardianship because the maternal grandparents did not have standing to bring either petition. Specifically, with respect to the second petition, Courtney submits the trial court erred by finding that she was unable to care for H.B. on March 2, 2012.

¶ 40 To resolve the issue regarding the propriety of the trial court's findings entered on March 2, 2012, we again turn to the language of the Probate Act for guidance. The Probate Act required the trial court to first determine whether the maternal grandparents rebutted the presumption that Courtney was willing and able to make the day-to-day child care decisions for her daughter. 755 ILCS 5/11-5(b) (West 2010).

-9-

¶ 41    After addressing the issue of standing, the Probate Act provides that the court was then required to consider the best interest of the child *before* entering the second order of guardianship on March 2, 2012. 755 ILCS 5/11-5(a) (West 2010) (stating that a court may appoint a guardian as the court finds to be in the best interest of the minor). While the trial court addressed the issue of standing in the second petition by finding that Courtney was willing but not able to make the day-to-day child care decisions for H.B., the court did not make any factual determination regarding whether H.B.'s father was willing and able to make the day-to-day child care decisions for H.B. Significantly, the court did not consider or make a finding concerning H.B.'s best interest based on the evidence presented to the court.

¶ 42    While not directly on point, the decision of *In re Guardianship of A.G.G.*, 406 Ill. App. 3d 389 (2011), is helpful and instructive.[5] In *A.G.G.*, the court noted "[t]he standards of the best interests of the minor, in paragraph (a) [of section 11-5 of the Probate Act], and a parent who is 'willing and able,' in paragraph (b), are separate questions of fact." *Id.* at 393.

¶ 43    In that case, the court emphasized that there were two separate standards to be used when deciding whether a parent was willing and able to care for a minor and whether guardianship was in the best interest of said minor. Compare 755 ILCS 5/11-5(b) (West 2010), and 755 ILCS 5/11-14.1(b) (West 2010). The appellate court further relied on the fact that, under comparable statutory schemes such as the Juvenile Court Act and Adoption Act, the abilities of a parent and the best interest of a minor are two separate issues, and there is potential for prejudice and confusion when these issues are not properly separated. *A.G.G.*, 406 Ill. App. 3d at 395.

¶ 44     Similarly, applying the provisions of the Probate Act in this case, we conclude the trial court was required to make the necessary but *separate* findings regarding whether H.B.'s parents were "willing and able" to make and carry out the day-to-day child care decisions for H.B. and findings regarding the "best interest of the minor." 755 ILCS 5/11-5 (West 2010). In spite of good intentions, the trial court did not conduct the necessary bifurcated examination of these two *separate* factual issues before granting the second petition for guardianship in favor of the maternal grandparents on March 2, 2012.

¶ 45    We are not unsympathetic to the fact that the trial court repeatedly sought guidance from both the grandparents' attorney and the GAL about the application of the Probate Act in this case. Addressing the court's concerns pertaining to the superior nature of parental rights of living parents, the grandparents' attorney mistakenly asserted the Probate Act allowed the

---

[5]In *A.G.G.*, an unrelated caretaker for a minor filed a petition for guardianship under the Probate Act. *A.G.G.*, 406 Ill. App. 3d at 390. The minor's biological mother responded by stating the caretaker had not overcome the presumption that she was willing and able to carry out day-to-day child care decisions for the minor. *Id.* at 391. The trial court denied the biological mother's motion to dismiss and held an evidentiary hearing. *Id.* at 392-93. The court then denied the caretaker's petition after finding that he had not proven by a preponderance of the evidence that the biological mother was unwilling and unable to provide the day-to-day care of the minor. *Id.* at 393. The appellate court held the trial court erred because the court did not conduct a hearing on standing, and the court entertained evidence solely on the best interest standard. *Id.* at 394.

court to grant the second petition without first considering the best interest of H.B. This assertion was clearly erroneous. Therefore, due to the absence of any factual determination by the court that guardianship would be in H.B.'s best interest, the March 2, 2012 order of guardianship must be vacated. Due to our resolution of this issue, we need not decide the additional issues raised in this appeal.

¶ 46    The impact of our decision restores Courtney's prerogative, as a biological parent, to exercise her superior parental rights and act as (or designate another person to act as) the guardian of her own child. Recognizing H.B. has been in the exclusive custody of her maternal grandparents, pursuant to an invalid court order since November 19, 2010, it is difficult to imagine how this degree of separation has not impacted the mother/daughter relationship between Courtney and H.B. Therefore, we encourage all parties and their attorneys to be mindful of H.B.'s emotional and physical needs during the pendency of all matters in the trial court.

¶ 47                                                    CONCLUSION

¶ 48    For the foregoing reasons, we reverse the first order of guardianship entered on November 19, 2010, because the order was not preceded by any finding regarding Maria's standing to proceed on the first petition. While the court addressed the standing issue with respect to the second petition, the court failed to make any finding pertaining to the child's best interest. Therefore, we also vacate the court's March 2, 2012, order granting the second petition for guardianship under the Probate Act.

¶ 49    Reversed in part and vacated in part.