2026 IL App (1st) 241981-U

FIRST DISTRICT
SIXTH DIVISION
February 13, 2026

No. 1-24-1981

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* ESTATE OF MADISON F. and JAINA F., Minors | ) ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| (Bobbi W. and Randie W., | ) ) | |
| Petitioners-Appellees, | ) ) | No. 2023P007913 |
| v. | ) ) | |
| Jaime W., | ) ) | The Honorable Jamie Dickler, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court correctly found petitioners had standing to proceed with guardianship petition where they successfully rebutted the presumption that minors' parents were willing and able to make and carry out day-to-day childcare decisions.

¶ 2    Following Jaime W. and Marc F.'s divorce in 2012, Jaime was awarded sole custody of their daughters Madison and Jaina. Marc was granted supervised visitation, but his rights were suspended in April 2013. Marc has not had any contact with his daughters since then. Under

Jaime's care, Madison and Jaina were subjected to her volatile behavior, verbal and mental abuse, and neglect of their medical and educational needs. This culminated on November 13, 2023, when petitioners Bobbi W. and Randie W. filed a Petition for Guardianship of Minor under section 11-5 of the Probate Act of 1975 (Act) (755 ILCS 5/11-5 (West 2024)). On May 28, 2024, following a three-day evidentiary hearing, the trial court found petitioners rebutted the presumption that Marc and Jaime are willing and able to make and carry out day-to-day childcare decisions and appointed Bobbi and Randie as co-guardians. Only Jaime appeals, arguing petitioners failed to rebut this presumption and, therefore, lacked standing to petition for guardianship. We disagree and, therefore, affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Jaime and Marc were married from January 2005 to May 2012. Following their divorce, Jaime was granted sole custody of Madison and Jaina, and Marc was granted supervised visitation. On April 2, 2013, Marc's visitation rights were suspended until further order of the court or by written agreement of the parties because he failed to give "notice of his parenting time over Christmas 2012-2013," "ha[d] not exercised his supervised visitation with the minor[s]," and "failed to comply with [the Department of Children and Family Services (DCFS)] requests for sufficient contact *** for DCFS investigation." Marc has not contacted his daughters or changed the order since then.

¶ 5        On November 13, 2023, the children's aunt Bobbi and their maternal grandmother Randie petitioned under section 11-5 of the Act (755 ILCS 5/11-5), to become co-guardians of Madison (then 16) and Jaina (then 14). The petition alleged Jaime was unwilling and unable to make and carry out day-to-day childcare decisions because she (1) prohibited the minors from attending school since October 2023; (2) physically abused Madison and threatened physical

violence against both minors and their dogs; (3) isolated the minors from adults they rely on for emotional stability; and (4) verbally abused the minors by calling them disparaging names and telling them she wishes they were never born. Both minors nominated Bobbi to be their guardian. See 755 ILCS 5/11-5(c) (minors 14 years or older may nominate a guardian).

¶ 6    On November 17, 2023, Susan DeCostanza was appointed Guardian ad Litem (GAL). On December 6, 2023, Jaime filed her appearance through counsel. On December 14, 2023, DeCostanza filed an Emergency Motion for In Camera Interview with Minors and For Emergency Care Plan, confirming the minors had been absent from school from October 23 through November 24, 2023, and DCFS referred Jaime to Intact Family Services. On December 15, 2023, the trial court conducted an *in camera* interview with the minors and ordered Jaime to ensure they attend school regularly and comply with all recommended Intact Family Services. The same day, Marc appeared via Zoom and the court ordered him to file an appearance by January 5, 2024. On January 11, 2024, a secondary GAL was appointed to represent the minors.

¶ 7    On January 25, 2024, DeCostanza filed a report detailing her investigation and findings, which are summarized in her testimony below. The same day, the court entered an order indicating "[t]he parties agree that the minors will stay with Grandmother, Randie" and Jaime will drive them to school.

¶ 8    On February 20, 2024, Jaime's counsel moved to withdraw. The next day, the court entered an Order on Petition for Guardian of a Minor, which provides that Jaime and her counsel were present, continues the petition, and orders "[p]etitioner shall retain custody of the Minor[s] and is authorized to make all decisions related to [their] education, health and safety *** until further order of the Court." Jaime's counsel was then granted leave to withdraw. On March 13, 2024, Jaime's new counsel appeared, and an evidentiary hearing was scheduled for May.

¶ 9        On March 22, 2024, Jaime filed a motion to reconsider the Order on Petition for Guardian of a Minor, arguing the "award of temporary guardianship" was entered without notice and after her counsel moved to withdraw. The motion was noticed for May 22, 2024, the first day of the three-day evidentiary hearing. Marc filed his *pro se* appearance on April 9, 2024.

¶ 10                                A. Evidentiary Hearing

¶ 11        A hearing was held on May 22, 23, and 28, 2024, to address whether petitioners had standing under the Act to challenge the presumption that Jaime and Marc are "willing and able" to make daily childcare decisions (755 ILCS 5/11-5(b)).

¶ 12                                1. Facts Relating to Jaime

¶ 13        Stacy R., a friend of Jaime for over 30 years, testified she observed Jaime becoming more agitated and erratic toward her children. In spring 2023, after a DCFS call, Jaime kicked her daughters out and left them in the condo lobby; Stacy offered help, but Jaime threatened to remove their dogs. Jaime later suggested Stacy care for Jaina temporarily, offering a stipend, but nothing happened. In May, after advice from her lawyer, Jaime argued with Stacy and then said she tried to have Madison leave the car at the police station.

¶ 14        In April or May 2023, Jaime met her boyfriend Alejandro, a refugee living at a police station or shelter before Jaime moved him into her home "on some whim." Stacy expressed her concern to Jaime about moving a man she barely knows into her home with two teenage daughters.

¶ 15        During summer 2023, Madison and Jaina stayed with Stacy most of the time, though this was unplanned. They briefly returned home but preferred to stay with Stacy until resuming school. On October 4, 2023, Jaime informed Stacy that DCFS was taking the minors after an argument; although Stacy offered to take them, Jaime insisted on foster care, calling the children

"spoiled." DCFS then asked Stacy to host them for a night, which she agreed to, prompting an angry outburst from Jaime, including profanity.

¶ 16    DeCostanza testified to her investigation and findings following her appointment as GAL in November 2023, which she summarized in her January 2024 GAL report. DeCostanza said she interviewed Madison and Jaina at their home on November 30, 2023, and later by phone. As of that date, they had missed a month of school because Jaime wanted to stop the school from calling DCFS. Though enrolled in a new school on November 27, between December 15, 2023, and January 25, 2024, Madison attended five of 16 days and Jaina seven.

¶ 17    Jaina described how Jaime called them "brutal names, curse words" like "b*** and c***" and "[told] the girls that she wished that they were never born, that she aborted them." Both minors described Jaime's harmful outbursts, which were now "daily" occurrences. In January 2024, Jaina ran away from home in the middle of the night after Jaime screamed at her for two hours. Both Madison and Jaina preferred that petitioners be appointed as their guardians.

¶ 18    DeCostanza interviewed Jaime by phone on November 28, 2023, and in person on December 1. Jaime said Alejandro moved in around May 2023 but withheld his last name and phone number. She was unemployed and not receiving child support from Marc, who had had no contact with the minors for over ten years. Jaime claimed Bobbi and Randie undermined her parenting by talking to the minors privately, giving them cell phones, and threatening to call DCFS. DeCostanza and Jaime discussed Madison and Jaina's "therapeutic treatment." The minors stopped outpatient therapy in the spring of 2023. However, Jaime believed Madison required inpatient treatment for a host of mental-health issues. DeCostanza was concerned because Jaime "had not taken steps to implement *** the mental health support the girls needed."

¶ 19      Jaime had not been in individual therapy since the late summer of 2023. Jaime's former individual therapist Benjamin Goldberger, a Licensed Clinical Social Worker at Jewish and Family Services, testified that he conducted a family therapy session in February or March 2023. He asked Madison to discuss her "rituals," which had been a source of conflict in the past. However, before Madison could finish speaking, Jaime began yelling, "I can't f*** take this. I can't f*** deal with this." Goldberger also confirmed that Jaime had tried to turn over care of Madison to the police.

¶ 20      From January 8 to 10, 2024, Madison was admitted to a partial hospitalization program (PHP) at Pathlight Mood and Anxiety Center. Psychiatrist Sonya Jayaratna confirmed Madison's participation in the program, as noted in her January 19 letter. Madison reported stress from court proceedings, conflicts with her mother, her sister running away, and past verbal and physical abuse. After she told school counselors about her unstable home life, her mother withdrew her from school, which prevented Madison from returning to pursue graduation. Jaime confronted Pathlight staff about care levels, called Madison's therapist incompetent, and described Madison as manipulative. Jaime discharged Madison after three days, against medical advice, citing poor care.

¶ 21      Dr. Jayaratna raised concerns about Madison's well-being, noting educational and medical neglect—Madison lacked regular school attendance, missed psychiatric visits, and was discharged from Pathlight against advice. Additionally, Jaime's verbally abusive behavior led to visible anxiety and distress in Madison. Goldberger and Dr. Jayaratna both shared their unease about the mother's parenting abilities with DeCostanza, supporting her own findings. DeCostanza also noted Jaime's lack of cooperation with Intact Family Services and concluded that Jaime was unwilling or unable to provide a safe, healthy environment or meet basic parenting standards.

¶ 22                                2. Facts Relating to Marc

¶ 23        DeCostanza spoke with Marc by phone on May 18, 2024. Marc said he cared about his daughters and wanted a relationship with them, but since April 2013, he had made no effort to see or contact them, nor to change the suspended visitation order. Given his lack of action for 11 years, DeCostanza did not believe Marc was willing or able to care for his daughters.

¶ 24        Marc testified he works as a server, owns a condo, and said it would be a "dream come true" to provide for his daughters. He stayed in Illinois after his divorce but rarely contacted them, texting Jaime only four times in eleven years. When his visitation rights were suspended, Marc sought free legal help but never tried to formally change the court order. He and Jaime intended to arrange for Marc to have primary custody if the guardianship petition was dismissed.

¶ 25                        3. Trial Court's Ruling and Post-Hearing Motions

¶ 26        The trial court determined that Jaime and Marc could not make day-to-day childcare decisions for the minors, thus, giving petitioners standing for the guardianship petition.[1] Following a hearing, the court found it in the minors' best interest to appoint Bobbi and Randie co-guardians. Jaime's attorney raised the motion to reconsider temporary guardianship; the court declared it moot but allowed parties to complete briefing.

¶ 27        On June 27, 2024, Jaime and Marc filed separate motions for relief under 735 ILCS 5/2-1203 (West 2024) and 735 ILCS 5/2-1301 (West 2024). On September 6, 2024, the trial court denied the motions for relief and Jaime's motion to reconsider the February 21, 2024, order. Only Jaime appeals.

---

[1] The trial court conducted *in camera* interviews of Madison and Jaina with the GALs present but stated it would not rely on these interviews as a basis for its findings.

¶ 28                                    II. ANALYSIS

¶ 29          Between Bobbi and Randie's appointment as co-guardians on May 28, 2024, and this appeal, Madison has turned 18 years old and is now emancipated. Accordingly, this appeal is moot as to Madison and only affects the guardianship of Jaina.

¶ 30          Initially, Jaime appeals the February 21, 2024, order that let Randie retain custody and decision-making over the minors, arguing it was improper since no emergency guardianship motion was filed and only her counsel's withdrawal was on the hearing schedule. This order was temporary and only effective during the guardianship proceedings. Since it was replaced by final orders appointing Randie and Bobbi as co-guardians, any challenge to it is now moot. See *In re Marriage of Fields*, 283 Ill. App. 3d 894, 901 (1996) (once the subject of a temporary order is heard on its merits, the temporary order is superseded by the final); *In re Lakita B.*, 297 Ill. App. 3d 985, 992 (1998) (an issue is moot where the reviewing court's decision has "no practical effect on the parties").

¶ 31          Jaime next argues petitioners lacked standing to proceed with their guardianship petition under the Act because they failed to rebut the presumption that Marc and Jaime are willing and able parents. We disagree.

¶ 32          Under section 11-5(b) of the Act, the court lacks jurisdiction over a petition for guardianship when "the minor has a living parent, *** whose parental rights have not been terminated, whose whereabouts are known, and who is willing and able to make and carry out day-to-day child care decisions concerning the minor." 755 ILCS 11-5(b) (West 2024). It is presumed that a parent is willing and able to make and carry out day-to-day childcare decisions, but this presumption can be rebutted by a preponderance of the evidence. *Id.* A petitioner that rebuts this presumption has standing to proceed with the petition, and the trial court must then

determine whether appointment of a guardian is in the minor's best interest. *In re R.L.S.*, 218 Ill. 2d 428, 436 (2006); *In re Estate of H.B.*, 2012 IL App (3d) 120475, ¶¶ 41, 44.

¶ 33 We review the trial court's factual findings under the manifest-weight-of-the-evidence standard and apply those facts *de novo* to determine whether petitioners have standing. *In re Guardianship of K.R.J.*, 405 Ill. App. 3d 527, 535 (2010). A trial court's finding is against the manifest weight of the evidence only if it is unreasonable, arbitrary and not based on the evidence, or the opposite conclusion is clearly evident from the record. *In re Guardianship of Tatyanna T.*, 2012 IL App (1st) 112957, ¶ 19.

¶ 34 It is futile on appeal for Jamie to try to justify her own actions and suitability as a parent based on the record. As such, she shifts the focus onto Marc, claiming petitioners have not overcome the presumption that he is willing and able to make and carry out day-to-day childcare decisions for their daughter. After a three-day hearing, and careful consideration of all facts in evidence, the trial court found Marc was "MIA for over a decade" and there is "nothing in the past 11 years that shows that he is willing or able to care for his daughters." Though Marc suggested "outside forces were stopping him from parenting *** or from even seeing his girls," there was "no evidence *** that was actually true." Rather, he tried to "pass off blame for the complete lack of contact that he had with his daughters, not so much as a call or a card to them directly in the last 11 years," and only reached out to Jaime four times over those 11 years for any update on them. These findings are not against the manifest weight of the evidence.

¶ 35 At best, even if Marc is legitimately now willing, after an 11-year absence, to parent Jaina, Marc's visitation rights were suspended by a 2013 court order, which he never sought to change. Despite blaming a lack of resources, Marc had 11 years to act either on his own or with Jaime's cooperation. He has not been involved in his daughters' lives since they were three and

four years old. Unlike the father in *In re Estate of Johnson*, 284 Ill. App. 3d 1080 (1996), who repeatedly tried to see his child and was actively involved, Marc neither visited nor contacted his daughters, and nothing prevented him but his own inaction.

¶ 36    As to Jaime, the trial court found she "goes scorched earth not on behalf of her children but towards [them]." The unimpeached and uncontradicted testimony showed Jaime verbally and mentally abused her daughters, told them they should have been aborted, tried to relinquish custody of Madison at a police station, and refused to comply with Intact Family Services. The court found this evidence far surpassed the mere struggles of raising teenagers, but a "lack of ability and lack of willingness to properly parent."

¶ 37    The court's detailed findings are amply supported by the record. The uncontradicted evidence shows Jaime verbally, mentally, and physically abused her daughters. Madison made "historical reports of physical abuse," including when Jaime pushed her into a wall and cornered her. Jaime called Madison and Jaina "brutal names, curse words" and told them "she wished that they were never born, that she aborted them." She kicked them out of the house and threatened to give away their dogs, forced Jaina to get out of the car on a busy highway, and tried to relinquish custody of Madison at a police station, yelling and screaming that she "didn't want Madison anymore." The verbal abuse escalated to the point that Jaina ran away from home after Jaime yelled at her for two hours. And not even a professional setting could deter Jaime, as she swore at Madison during a family therapy session and called her a "master manipulator" to Dr. Jayaratna. These are not mere squabbles or disagreements expected when raising teenagers; they are harmful words and actions that negatively impacted Madison and Jaina's well-being.

¶ 38    In addition, Jaime failed to secure mental health support for Madison and Jaina, despite her belief that inpatient treatment or a PHP was needed for Madison's executive functioning

issues, OCD, anxiety, and depression, and Jaina's anxiety. Notwithstanding, the minors were not receiving any therapeutic services and Madison had not seen her psychiatrist in over a year even though she was prescribed psychotropic medication. Although Jaime admitted Madison to Pathlight's PHP in January 2024, she withdrew her from treatment after just three days and never tried to admit her to a different program. Jaime also refused to comply with all Intact Family Services' recommendations, including individual therapy for the minors.

¶ 39        Jaime also neglected Madison and Jaina's basic educational needs, not as an oversight, but rather, a tactic to prevent school staff from reporting her to DCFS. This is why Jaime kept them out of school for a month and enrolled them in a new school mid-school year. And even after the trial court ordered Jaime to ensure their attendance, they only attended a few days of school in December 2023 and January 2024.

¶ 40        Contrary to Jaime's assertion, her actions were not isolated incidents or poor parenting decisions. They were frequent and serious abuses, which worsened and became more frequent in recent years. Jaime's increasingly volatile behavior, abuse, and neglect of her daughters' basic needs overwhelmingly support affirming the trial court's finding that she is neither willing nor able to make and carry out daily childcare decisions.

¶ 41                                III. CONCLUSION

¶ 42        The trial court's findings that Jaime and Marc are unwilling and unable to make and carry out day-to-day childcare decisions are not against the manifest weight of the evidence. As such, petitioners had standing to proceed with their guardianship petition. Accordingly, we affirm the trial court's judgment appointing Bobbi and Randie as Jaina's co-guardians.

¶ 43        Affirmed.