NOTICE

Decision filed 04/12/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200294-U

NO. 5-20-0294

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* ESTATE OF R.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (Jacquelynn D., | ) | St. Clair County. |
| | ) | |
| Petitioner and Counterrespondent-Appellant, | ) | |
| | ) | |
| v. | ) | No. 18-P-820 |
| | ) | |
| Shirley D., | ) | Honorable |
| | ) | Thomas B. Cannady, |
| Respondent and Counterpetitioner-Appellee). | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Welch and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court did not abuse its discretion by appointing respondent as guardian of both the person and estate of her deceased son's minor child, her four-year-old grandchild, and in awarding the petitioner, the child's adult sibling, limited visitation.

¶ 2    This appeal arises from a guardianship proceeding concerning R.D., a minor. Petitioner, Jacquelynn D., R.D.'s paternal half-sister, appeals from an order of the circuit court of St. Clair County granting respondent and counterpetitioner, Shirley D., R.D.'s paternal grandmother, guardianship of R.D.'s person and estate and awarding Jacquelynn limited visitation. For the following reasons, we affirm.

1

¶ 3                                    I. Background

¶ 4     R.D. is the biological child of Kristina J. and Ricardo D. R.D., who was born on November 6, 2015, lived with Kristina until she was removed from Kristina's custody and placed under the guardianship of the Illinois Department of Children and Family Services (DCFS) on February 29, 2016. DCFS initially placed R.D. with a relative but later placed R.D. in a traditional foster care home. R.D. remained in the same foster care home until January 2018, when DCFS placed her in Ricardo's care. Thereafter, Ricardo and R.D. lived with Ricardo's mother, Shirley, R.D.'s paternal grandmother, at her home in East St. Louis, Illinois.

¶ 5     On July 6, 2018, following the termination of the guardianship of DCFS, the circuit court granted Ricardo custody of R.D. Ricardo and R.D. continued to reside with Shirley until October 27, 2018, when Ricardo died performing his job duties as a Washington Park auxiliary police officer. At that time, Ricardo also had a 10-year-old son, Rylan D., with his girlfriend, Stephanie Reynolds, and several adult children from a previous relationship, including Jacquelynn, Ricardo D. Jr., and Briyan D.

¶ 6     On November 29, 2018, Jacquelynn and Ricardo Jr., R.D.'s half-siblings, filed a joint *pro se ex parte* petition for emergency care with temporary guardianship and a *pro se* petition for appointment of guardian of R.D. In the *ex parte* petition, Jacquelynn and Ricardo Jr. alleged that R.D. was without a legal guardian and in imminent danger because she was in the care of Stephanie, who had a pending drug-related charge. That same day, the circuit court entered an order appointing Jacquelynn as temporary guardian of R.D.'s person and appointing Greg Skinner, a local attorney, to serve as R.D.'s guardian *ad litem* (GAL). The order did not address Ricardo Jr.

¶ 7     On December 3, 2018, Shirley filed an emergency motion to vacate the November 29, 2018, temporary guardianship order and a counterpetition for immediate custody and guardianship of R.D.'s person and estate. In support of these filings, Shirley attached an affidavit attesting to the following. Ricardo and R.D. had resided with Shirley at her home since January 2018. Shirley and Ricardo had regularly scheduled weekend visits with R.D. at Shirley's home prior to January 2018. R.D. had special medical needs as a result of "skull fractures and additional injuries" sustained while in Kristina's care. Stephanie occasionally watched R.D. following Ricardo's death. Contrary to the allegations in the *ex parte* petition, Shirley attested that Stephanie had not been charged with any drug-related offenses. Shirley also attested that it would be "seriously detrimental to R.D.'s physical, mental and emotional health if she remain[ed] in physical custody, care and guardianship of [Jacquelynn] and/or [Ricardo, Jr.]."

¶ 8     On December 10, 2018, after Shirley withdrew her emergency motion to vacate and supporting affidavit, Shirley filed a second motion to vacate the November 29, 2018, order with a supporting affidavit, in which she attested to much of the same information as her original affidavit. Unlike her original affidavit, Shirley admitted that Stephanie had been indicted on drug charges. Shirley attested that she immediately stopped all contact between R.D. and Stephanie upon learning of the drug charges. Shirley also attested that Jacquelynn had stopped allowing R.D. visitation with Shirley, along with other paternal relatives. Lastly, Shirley attested that it was in R.D.'s best interest to be "immediately returned to the home that she knows and loves with her grandmother who loves her and knows how to care for her special needs." The circuit court subsequently denied Shirley's motion to vacate but allowed Shirley visitation with R.D. on Christmas Day.

¶ 9    On December 17, 2018, Kristina filed a *pro se* petition, requesting that the circuit court place R.D. in her care and objecting to anyone else serving as R.D.'s guardian. In support, Kristina alleged, *inter alia*, that she was R.D.'s biological mother and that her parental rights had not been terminated. She also alleged that she was ready, willing, and able to care for R.D.

¶ 10    On May 1, 2019, Jacquelynn, represented by counsel, filed an amended petition for guardianship of R.D.'s person and estate. In the petition, Jacquelynn provided names and addresses of R.D.'s "nearest adult relatives" and alleged that Kristina was "unwilling and/or unable to make, and carry out, day-to-day decisions concerning [R.D.]." Jacquelynn also alleged that R.D.'s estate had no "approximate value." Shirley filed an answer to Jacquelynn's amended petition on June 4, 2019, alleging that Jacquelynn failed to disclose R.D.'s income. No other relatives, including Ricardo Jr. and Briyan, responded.

¶ 11    On July 9, 2019, Shirley filed an answer to Kristina's December 17, 2018, *pro se* petition, admitting that Kristina's parental rights had not been terminated but alleging that Kristina did not have court-ordered visitation with R.D. and that Kristina had not completed certain requirements set in place by DCFS to regain custody of R.D. At a hearing held that same day, the circuit court dismissed Ricardo Jr. as a petitioner.

¶ 12    On September 13, 2019, in response to several discovery requests filed by Shirley, Jacquelynn filed a motion for extension of time, requesting an additional 14 days to submit the requested discovery. On December 5, 2019, before the circuit court ruled on Jacquelynn's motion for extension of time, Shirley filed a motion for sanctions, requesting that the court strike Jacquelynn's pleadings as a sanction "for failing to answer [i]nterrogatories and [s]upplemental [i]nterrogatories and produce requested documents." Shirley also requested an award of attorney fees and an assessment of a $1000 penalty against Jacquelynn.

4

¶ 13   On December 17, 2019, Jacquelynn failed to appear at a hearing on the motions pertaining to discovery. Consequently, the circuit court entered an order denying Jacquelynn's motion for extension of time and granting, in part, Shirley's motion for sanctions. In addition to striking Jacquelynn's previous pleadings, the court terminated Jacquelynn's temporary guardianship. The court, with Kristina's consent, appointed Shirley as temporary guardian of R.D.'s person and estate and awarded Kristina two hours of supervised parenting time with R.D. on Christmas Day and every other Sunday "until further court order." The court denied Shirley's request for attorney fees and monetary penalties.

¶ 14   On January 10, 2020, Jacquelynn filed a motion to vacate the circuit court's December 17, 2019, order, alleging that she had inadvertently missed the hearing due to confusion with other court dates. The circuit court subsequently reinstated Jacquelynn's pleadings but allowed Shirley to continue to serve as R.D.'s temporary guardian.

¶ 15   On February 26, 2020, Jacquelynn filed a petition for visitation, alleging that Shirley had denied her visitation with R.D. and that the denial of visitation would "result in emotional harm to [R.D.]." Shirley filed an answer to Jacquelynn's petition for visitation on July 27, 2020, alleging that it was not in R.D.'s best interest to have visits with Jacquelynn. In support, Shirley asserted that "a DCFS action was filed as a result of an incident that happened while [R.D.] was in the care of [Jacquelynn], and [R.D.] has been diagnosed with Post-traumatic Stress [S]yndrome after previously having [Jacquelynn] as her guardian."

¶ 16   On July 28, 2020, the circuit court conducted an evidentiary hearing on the parties' cross-petitions for plenary guardianship of the person and estate of R.D. At the outset of the hearing, the court clarified that Kristina was present with counsel but that she was only seeking visitation

with R.D., not guardianship as previously requested in her December 17, 2018, *pro se* petition. The following factual recitation is taken from the evidence adduced at the hearing.

¶ 17                     A. Jacquelynn D.'s Testimony

¶ 18    Jacquelynn testified to the following on her own behalf. Jacquelynn learned that, after Ricardo's death, Shirley was allowing Stephanie to care for R.D. but "wasn't going to put [Stephanie's] name on anything." Jacquelynn filed a petition for guardianship after learning that Stephanie had pending "indictment charges." Jacquelynn then served as R.D.'s temporary guardian for approximately 13 months. In that time, Jacquelynn and R.D. lived with Jacquelynn's mother, Yekita Diggs, along with Jacquelynn's brothers, Ricardo Jr. and Bryian, in Fairview Heights, Illinois. Jacquelynn was R.D.'s primary caretaker, although her mother and brothers watched R.D. when Jacquelynn was at school or work. Jacqueline believed that she could financially support R.D. and that her family would continue to assist with R.D.'s care if she were appointed as R.D.'s permanent guardian.

¶ 19    Jacquelynn testified that she currently "work[s] on and off like here and there," and occasionally performs independent contracting, such as preparing paperwork for companies. In response to inquiries posed by the circuit court, Jacquelynn clarified that she earned approximately $1500 per month doing nails. Jacquelynn also confirmed that she received Supplemental Nutrition Assistance Program (SNAP) benefits. On cross-examination, Jacquelynn admitted that her April 2019 interrogatory answers indicated that she had not worked in two years and her only income was from BackStoppers and student loans. Jacquelynn also admitted that she did not know if her mother was employed or if her mother paid rent or owned the house in Fairview Heights. Jacquelyn further admitted that she had not paid any of the monthly household bills and did not know the total cost of the bills.

6

¶ 20    While R.D. was in Jacquelynn's care, Jacquelynn observed R.D. use curse words, throw temper tantrums, and have difficulties getting along with other children. Jacquelynn had to "fix" R.D.'s temper tantrums, potty train her, and teach her basic manners, such as "how to say thank you and please." Jacquelynn also scheduled doctor's appointments to seek treatment for R.D.'s medical issues. R.D. suffered from hip dysplasia and was eligible for surgery, but doctors advised Jacquelynn that surgery was optional and unnecessary. R.D. also had difficulties straightening one eye, which Jacquelynn believed was associated with R.D.'s prior head injury. According to Jacquelynn, R.D.'s eye was not a major issue because R.D. could straighten it by closing both eyes. On cross-examination, Jacquelynn admitted that she did not schedule an appointment with an ophthalmologist for R.D.'s eye issue and that she had only taken R.D. to the pediatrician twice.

¶ 21    Jacquelynn testified that she would be a better guardian than Shirley for several reasons. First, Jacquelynn was able to handle R.D.'s temper tantrums, while Shirley generally relied on Rylan, R.D.'s half-brother, to deal with the tantrums. Jacquelynn believed that, due to her old age, Shirley was likely to be injured when R.D. started kicking, punching, and pushing during a temper tantrum. Second, Jacquelynn was significantly younger than Shirley and, thus, better able to take R.D. places and do things with R.D. Third, Jacquelynn had a close bond with R.D. after caring for her for 13 months. On cross-examination, Jacquelynn acknowledged that she occasionally had a babysitter for R.D. on the weekends but claimed that "[she] sent [R.D.] because [R.D.'s] little sisters were over there and [she] wanted her to be able to talk to them and see them." When questioned about the DCFS investigation that took place while R.D. was in her care, Jacquelynn explained that Kristina had spilled hot water while braiding R.D.'s hair, resulting in a burn to R.D.'s arm. Jacquelynn claimed that she noticed the burn the next day and

7

took R.D. to the pediatrician, who prescribed an ointment. Jacquelynn later testified that she followed all of the pediatrician's recommendations, including changing bandages and applying burn cream to R.D.'s arm.

¶ 22    Jacquelynn testified to the following in response to several additional questions posed by the circuit court. If Jacquelynn were appointed guardian, R.D. would, again, live in Jacquelynn's mother's four-bedroom house with Jacquelynn, her mother, and her two brothers. R.D. would sleep in Jacquelynn's room in a toddler bed that Jacquelynn had previously purchased. Jacquelynn later clarified that R.D. would live in the East St. Louis school district, but that she anticipated enrolling R.D. in a private school in Collinsville, Illinois.

¶ 23    On cross-examination, Jacquelynn acknowledged that she was not listed on the occupancy permit for her mother's house in Fairview Heights. She admitted that she had listed a different mailing address, 541 Susan Drive, in a separate court proceeding and on her bank accounts. Jacquelynn further admitted that she had set up a GoFundMe page with an initial goal of $300,000 following Ricardo's death. She also admitted that BackStoppers had paid for Ricardo's funeral and R.D.'s Christmas presents. Jacquelynn confirmed that she received additional money after Ricardo's death, including $2000 from BackStoppers and a lump sum payment of $2500 plus monthly payments of $496 in Social Security benefits for R.D. Jacquelynn admitted, however, that she had neither set up a bank account in R.D.'s name nor filed an estate accounting for the money received. She additionally confirmed that Shirley was not given any of the money while appointed as R.D.'s guardian.

¶ 24    When questioned by Kristina's counsel, Jacquelynn testified that she wanted guardianship because she loved R.D., and R.D. had suffered countless losses and been moved from home to home. Jacquelynn failed to mention R.D. on the GoFundMe page because she was

8

unfamiliar with the process. Jacquelynn did not notify Kristina of the *ex parte* petition because she did not know Kristina or know her address. Jacquelynn initially allowed Kristina to visit with R.D. However, Jacquelynn and Kristina's relationship soured after R.D. was accidently burned. R.D. had a skin condition that required daily applications of a prescribed skin cream, which Jacquelynn applied until R.D.'s skin condition cleared up.

¶ 25    When questioned by the GAL, Jacquelynn clarified that the occupancy permit for the house listed her aunt and her aunt's three children, but Jacquelynn claimed they had relocated before Jacquelynn and R.D. resided at the house. Jacquelynn previously lived at 541 Susan Drive in Belleville, Illinois, but she had since moved and did not know the current residents at that address. Jacquelynn also clarified that BackStoppers would pay R.D.'s tuition to attend a private school, along with all expenses for daycare and insurance coverage.

¶ 26                         B. Kristina J.'s Testimony

¶ 27    Kristina testified to the following as an adverse witness on behalf of Shirley. During Jacquelynn's guardianship, Kristina was only allowed to visit R.D. on two occasions in February and May of 2019. Kristina identified photographs that she had taken of R.D. without Jacquelynn's knowledge during the May 2019 visit, which Kristina described as depicting R.D. in dirty clothes with a burned arm. According to Kristina, one photograph demonstrated that R.D.'s arm had been burned prior to the visit. In response to an inquiry by the circuit court, Kristina denied ever spilling hot water on R.D.'s arm. Kristina decided to take pictures after observing that R.D.'s "hair was not combed, her face was dirty, her feet were dirty, [and] her eczema was out of control." Kristina reported her concerns regarding R.D.'s care to DCFS. During the DCFS investigation, Jacquelynn's mother requested that Kristina lie to DCFS's investigators and falsely claim that she had accidentally burned R.D. When Kristina refused,

9

Jacquelynn stopped Kristina's visits with R.D. Jacquelynn's mother also repeatedly requested that Kristina agree to Jacquelynn serving as R.D.'s guardian and even attempted to bribe Kristina by paying two of Kristina's phone bills. Kristina was permitted to regularly call and visit R.D. after Shirley was appointed as guardian. Kristina believed that it was in R.D.'s best interests for Shirley to be appointed plenary guardian.

¶ 28 On cross-examination, Kristina testified that she lost custody of both of her daughters, including R.D. The circuit court then stated, in pertinent part, the following summary pertaining to the previous juvenile case involving R.D.:

> "THE COURT: I want to give some guidance so we can move this along. This court is very familiar with case number 16-JA-17. I think I can disclose certain things. There was a petition filed in that case on February 29, 2016. Keeping in mind that this child [(R.D.)] was born 11-6-15. There was a court order entered on July 6, 2018 whereby the minor [was] to remain home with the father [(Ricardo)], and in particular, custody of the minor was restored to the father. Guardianship of the minor was restored to the father pursuant to court order ***."

Following the court's summary, Kristina testified that Ricardo had been living "on and off" with Shirley when he received custody of R.D., but Kristina believed that Ricardo was also residing with several women and was unstable at that time.

¶ 29 Kristina testified that Shirley would be a better guardian for R.D. than Jacquelynn for several reasons. Shirley, unlike Jacquelynn, was financially stable. In addition, Shirley had a good relationship with R.D., and she had a separate bedroom room for her. Shirley also had help from others in caring for R.D., and Kristina did not believe that Shirley would prevent her from visiting R.D. Although Shirley was older than Jacquelynn, Shirley was healthy and capable of caring for R.D. Kristina had no concerns over Shirley's ability to provide R.D. with proper care. Kristina believed that when Ricardo had custody of R.D., Shirley was caring for R.D. more than Ricardo.

10

¶ 31    Shirley, a 76-year-old retired teacher and principal, testified to the following on her own behalf. Shirley lived comfortably on her pension income, which was also sufficient to meet R.D.'s needs, at her home in East St. Louis. Shirley had a previous guardianship of two other children, which included her grandchild, Cedric, who she raised until he reached adulthood, and an unrelated child, who returned to his family in March 2019.

¶ 32    After Ricardo gained custody of R.D., R.D. frequently stayed with Shirley at her home. Ricardo placed R.D. in the daycare where Stephanie worked and named Shirley as the emergency contact. While the daycare provided transportation to and from the facility, Stephanie occasionally transported R.D., so R.D. could visit her half-brother, Rylan. R.D. had received therapy in daycare, which ended when Jacquelynn was appointed guardian. After Shirley was appointed guardian, Shirley was able to enroll R.D. in the Vivian Adams Early Childhood Center. Due to the pandemic, R.D. used a tablet to participate in lessons at home. Shirley had "a young lady" who was able to help R.D. with the technology. R.D. will begin kindergarten in August 2021.

¶ 33    After Ricardo died, but before Jacquelynn was appointed guardian, Shirley scheduled appointments for R.D. with an ophthalmologist and an orthopedist. R.D.'s ophthalmologist advised Shirley to monitor R.D.'s eye movement, as surgery would be necessary if R.D.'s eye became stuck in place. R.D.'s orthopedist recommended a follow-up appointment because R.D. was a potential candidate for hip surgery. Shirley scheduled the follow-up appointment after she was appointed guardian in December 2019, as Jacquelynn had missed and rescheduled appointments during her guardianship of R.D. Within three days of Shirley's guardianship appointment, Shirley also arranged for R.D. to undergo a Magnetic Resonance Imaging (MRI)

11

scan and a medical examination to check on R.D.'s brain injuries and shunt. In June 2020, R.D. underwent her first hip surgery. Approximately four weeks later, R.D. underwent a second hip surgery, which was followed by eight weeks of recovery. Shirley initially received a wheelchair from BackStoppers, which was replaced with a child recliner due to R.D.'s leg braces causing her to slide out of her wheelchair.

¶ 34　While caring for R.D., Shirley observed R.D. "go into rages." Shirley recalled one particular incident where R.D. raised a plastic knife in her hand and threatened to stab Shirley. R.D. used the term "snitch" and feared being locked in the basement. Out of concern, Shirley took R.D. to a doctor, who diagnosed R.D. with post-traumatic stress syndrome (PTSD). Shirley attempted to find a therapist who would treat R.D. for PTSD, but, so far, she had been unsuccessful due to R.D.'s young age. However, Shirley had been working with R.D., which was successful "to some degree." While R.D. was in Jacquelynn's care, Shirley visited R.D. on Sundays. Shirley brought Rylan to the visits because R.D. and Rylan have a close relationship.

¶ 35　When Shirley was appointed guardian, Shirley immediately contacted social security and opened an account for R.D. at Scott Credit Union. In response to an inquiry by the circuit court, Shirley clarified that she deposits R.D.'s monthly social security benefits of approximately $500 into the account and uses those funds for R.D.'s care. Shirley used $2000 dollars from BackStoppers to purchase a big storage chest for R.D.'s clothes and to pay for R.D.'s Christmas and clothing items. Shirley and R.D. have performed various activities together since Shirley's appointment as guardian. They regularly go to the park and recently went on a camping trip. R.D. also spends supervised time with Rylan and Kristina at Shirley's residence. Stephanie drops Rylan off for the visits but does not stay or enter Shirley's residence. R.D. recently attended a school dance with two uncles, Ramero D. and Chris D. Shirley and Ramero, who is a father

12

figure to R.D., take turns reading to R.D. Shirley has encouraged R.D. to have friendships with her cousins and the neighborhood children.

¶ 36    Shirley denied telling Jacquelynn that R.D. was living with Stephanie. Shirley believed that Jacquelynn had received $2000 from BackStoppers three days before Shirley was appointed as guardian, but Jacquelynn had not given Shirley any of the money. Since Shirley was appointed as guardian, Jacquelynn has not called or checked on R.D. When the circuit court asked if Shirley had a problem with Jacquelynn visiting R.D., Shirley responded that she did not anticipate a problem but claimed Jacquelynn had not requested visitation. Shirley later testified that she was concerned that visits with Jacquelynn would negatively impact R.D.'s emotional health because R.D. needed stability, given R.D. had PTSD and had frequently moved between multiple homes in the past. Shirley had denied other family members' requests for visits with R.D. for similar reasons. According to Shirley, it was in R.D.'s best interests to remain in her care, given that Jacquelynn had not seen R.D. since December 17, 2019.

¶ 37    Shirley testified to the following on cross-examination. Although Shirley was unaware that Jacquelynn had filed pleadings requesting visitation with R.D., she repeatedly expressed her concern that R.D. needed stability. R.D. is the only child that permanently resides with Shirley, but Shirley also provides care for another child on the weekends. Shirley claimed that she herself did not have any health concerns, other than "a few pains here and there once in awhile [*sic*] but nothing that Tylenol can't take care of." If appointed as plenary guardian, Shirley would continue to allow Kristina visitation with R.D., and, if ordered by the court, she would allow Jacquelynn visitation with R.D.

13

¶ 38                              D. Ramero D.'s Testimony

¶ 39    R.D.'s uncle, Ramero, testified to the following on behalf of his mother, Shirley. Ramero had observed Shirley's interaction with R.D., and he believed that Shirley was capable of providing R.D. with proper emotional, financial, and medical care. Ramero had a close relationship with R.D. and had served as her father figure after Ricardo's death. Ramero took R.D. to a school dance, and they frequently played together. On one occasion, R.D. had referred to Ramero as dad. Ramero confirmed that R.D. had a good relationship with Rylan.

¶ 40    When R.D. first came into Shirley's guardianship following the termination of Jacquelynn's guardianship, R.D. said inappropriate things, such as, "[a]re you going to put me in a closet or, you know, hit me or something to that effect," causing Ramero to be concerned that "some things were possibly going on while [R.D.] was staying with [Jacquelynn]." Ricardo believed that Jacquelynn would not allow him or Shirley to visit R.D. if appointed as guardian.

¶ 41    On cross-examination, Ramero testified that he did not contact R.D. while she was in Jacquelynn's guardianship, due to the pending litigation. Ramero claimed that he did not witness any physical problems with Shirley that would prevent her from properly caring for R.D.

¶ 42                              E. The GAL's Testimony

¶ 43    The GAL testified to the following on behalf of Shirley. The GAL had no concerns regarding Jacquelynn's mother's residence, which he described as a nice home, or the number of occupants previously listed on the permit. During a visit to the residence, the GAL observed a "trundle bed" in Jacquelynn's bedroom that was set up for R.D. Nevertheless, the GAL recommended that the circuit court appoint Shirley as plenary guardian of R.D.'s person and estate. The GAL also recommended that the court allow Jacquelynn to have scheduled visitation with R.D. The GAL further recommended that Kristina's visitation remain supervised with

DCFS's continuing approval. Lastly, the GAL commented that he initially had some concerns regarding Shirley's age, but he had determined that Shirley was "an intelligent lady," who also seemed to have "[R.D.'s] interest at heart."

¶ 44 Prior to taking the matter under advisement, the circuit court commented that R.D. would not turn 18 for approximately 13 years, at which time Shirley would turn 90. The court recognized that further litigation would be necessary if Shirley's health changed while caring for R.D.

¶ 45 On August 3, 2020, the circuit court entered an order appointing Shirley as guardian of R.D.'s person and estate and awarding Jacquelynn six consecutive hours of weekly unsupervised visitation with R.D. beginning on August 21, 2020. The court also ordered that Jacquelynn's visitation was subject to review in December 2020 and directed the GAL to appear at that setting to address the visitation conditions and schedule. The court later clarified that the order did not affect Kristina's parenting time with R.D., and that Kristina's parenting time would take preference over future conflicts with Jacquelynn's visitation times. Jacquelynn filed a timely notice of appeal on September 22, 2020.[1]

¶ 46                                  II. Analysis

¶ 47 To begin, we address two preliminary matters. First, this is an expedited appeal, pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), involving the custody of a minor. The notice of appeal was filed on September 22, 2020, and, under subsection (5) of Rule 311(a) (Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018)), our decision was due on February 19, 2021. However, the briefing schedule was delayed due to Jacquelynn's failure to request the preparation of the

---

[1]See administrative order of the Illinois Supreme Court M.R. 30370 (eff. Mar. 24, 2020) (extending the deadline for filing a notice of appeal in the circuit court from 30 days to 60 days from the entry of the judgment due to ongoing public health concerns relating to Covid-19).

15

transcript from the July 28, 2020, hearing. On Jacquelynn's motion to supplement the record, the transcript was filed with this court on January 25, 2021. Shirley was then granted a seven-day extension to file her response brief, and we allowed Jacquelynn until February 8, 2021, to file a reply brief. Consequently, we find good cause for this decision to be issued after the 150-day deadline mandated by Rule 311(a)(5).

¶ 48   Second, we observe that the parties' respective briefs violate several Illinois Supreme Court Rules. Jacquelynn's brief does not contain: (1) a signed certification that the brief complies with form and length requirements (see Ill. S. Ct. R. 341(c) (eff. Oct. 1, 2020)); (2) an introductory paragraph (see Ill. S. Ct. R. 341(h)(2) (eff. Oct. 1, 2020)); (3) a statement of the issues presented without detail or citation of authorities (see Ill. S. Ct. R. 341(h)(3) (eff. Oct. 1, 2020)); (4) a statement of jurisdiction under a separate heading (see Ill. S. Ct. R. 341(h)(4)(ii) (eff. Oct. 1, 2020)); (5) references to the pages of the record in the statement of facts (see Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020)); or (6) references to the pages of the record in the argument section (see Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020)). Additionally, Jacquelynn's argument section contains only eight sentences related to her first claim of error and six sentences related to her second claim of error with only a brief citation to relevant legal authority.

¶ 49   Similarly, Shirley's responsive brief, which only addresses Jacquelynn's first claim of error, relies on one miscited case, "*In re Austin* [*W.*], 823 N.E.2d 572[, 584], 291 Ill. Dec. 280[, 292], 214 Ill. 2d 31[, 49] (West 2005)," for the proposition that in guardianship matters the dispositive issue is the best interest of a child. However, *In re Austin W.*, 214 Ill. 2d at 41, involves a motion to modify a dispositional order filed by the GAL pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq*. (West 2018)), not the Probate Act of 1975 (Probate Act) (755 ILCS 5/1-1 *et seq.* (West 2020)). Moreover, Shirley's statement

of facts is devoted exclusively to the procedural history of the case and her argument section merely summarizes the witnesses' testimonies. Shirley makes no cohesive argument that applies the underlying facts to the factors related to R.D.'s best interests.

¶ 50 A reviewing court is entitled to the benefit of clearly defined issues with pertinent authority cited and a cohesive legal argument. *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶ 5. This court is not a depository into which a party may dump the burden of argument and research. *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56. "The purpose of the rules is to require parties to present clear and orderly arguments, supported by citations of authority and the record, so that this court can properly ascertain and dispose of the issues involved." *Burrell v. Village of Sauk Village*, 2017 IL App (1st) 163392, ¶ 14. Where, as here, an appellant's brief fails to comply with supreme court rules, we have discretion to strike a brief, to dismiss an appeal, or to disregard an appellant's arguments. *Budzileni v. Department of Human Rights*, 392 Ill. App. 3d 422, 440 (2009); see also *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 1088 (1995) (supreme court rules apply with equal strength to appellees and cross-appellees). Striking a brief "is a harsh sanction and is appropriate only when the violations of the procedural rules hinder our review." *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 15.

¶ 51 In the present case, despite the deficiencies, we can generally discern Jacquelynn's claims of error with respect to the circuit court's August 3, 2020, order appointing Shirley plenary guardian of R.D.'s person and estate and awarding Jacquelynn only limited visitation. Accordingly, we will address the claims of error raised in this expedited appeal. See *Twardowski v. Holiday Hospitality Franchising, Inc.*, 321 Ill. App. 3d 509, 511 (2001) (reviewing the merits even though substantial rule violations); see also *Parkway Bank & Trust Co. v. Korzen*, 2013 IL

17

App (1st) 130380, ¶ 10 (despite multiple Rule 341 violations, a reviewing court may choose to review the merits). However, we strongly admonish counsel for both parties to strictly adhere to the requirements of supreme court rules in future submissions. We now turn to the merits.

¶ 52    Jacquelynn raises two claims of error on appeal. First, she argues that the circuit court abused its discretion in appointing Shirley as plenary guardian of R.D.'s person and estate. In support, she argues that the court failed to consider Shirley's advanced age and deteriorating health. We disagree.

¶ 53    Sections 11-1 through 11-18 of the Probate Act (755 ILCS 5/11-1 through 11-18 (West 2020)) govern the appointment of a guardian of a minor. Section 11-5(a) of the Probate Act provides that the circuit court may appoint a guardian of either the person or estate of a minor, or, of both, "as the court finds to be in the best interest of the minor." 755 ILCS 5/11-5(a) (West 2020). Guardianship of a person includes a right to custody. 755 ILCS 5/11-13(a) (West 2020). "Historically, Illinois courts have found guidance in the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) [(750 ILCS 5/101 *et seq.* (West 2018))] when determining the best interests of a minor in guardianship proceedings [under the Probate Act]." *In re Guardianship of A.G.G.*, 406 Ill. App. 3d 389, 393 (2011). The Marriage Act provides several factors for determining a child's best interests, including, without limitation, the following:

> "(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;
>
> (2) the child's adjustment to his or her home, school, and community;
>
> (3) the mental and physical health of all individuals involved;
>
> (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

18

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c)(1)-(15) (West 2018).

The court has broad discretion in determining whether to appoint a guardian, and this court will not overturn the court's decision unless the court abuses its discretion or its decision is against the manifest weight of the evidence. *In re Estate of Green*, 359 Ill. App. 3d 730, 735 (2005).

¶ 54    Here, contrary to Jacquelynn's argument, the record plainly evidences that the circuit court carefully considered evidence concerning Shirley's physical health and age in reaching its decision. In fact, the court commented on Shirley's age and health prior to taking the matter under advisement, noting that Shirley would be 90 when R.D. turned 18 and that the matter may require additional litigation if Shirley's health deteriorated. In light of the court's comments, we reject Jacquelynn's claim that the court failed to consider Shirley's age and health.

¶ 55    We also note that the evidence presented at the hearing supports the circuit court's decision to appoint Shirley as guardian, despite her age and health. Kristina testified that Shirley was healthy and capable of caring for R.D. without issue and that Shirley would have help from others in caring for R.D. Kristina also testified that Shirley would make a better guardian than Jacquelynn because Shirley was more financially stable, had a separate bedroom for R.D., and had a good relationship with R.D. Kristina further testified that, while in Jacquelynn's care, R.D. was dirty, unkempt, and suffered a burn to one arm. In addition, Shirley testified that she had no health concerns, other than "a few pains here and there once in awhile [*sic*] but nothing that Tylenol can't take care of." Lastly, although the GAL initially had some concern regarding Shirley's age, he determined that Shirley was "an intelligent lady," who also seemed to have "[R.D.'s] interest at heart." Thus, the GAL considered Shirley's age and health in recommending that the court appoint Shirley as guardian.

¶ 56    Based on the foregoing, we cannot say that the circuit court abused its discretion in appointing Shirley as guardian due to her age and health. Aside from Shirley's age and health,

20

Jacquelynn makes no additional arguments relating to the factors set forth in section 602.5(c) of the Marriage Act (750 ILCS 5/602.5(c) (West 2018)). Accordingly, she has forfeited this court's consideration of any such arguments. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited ***."). Despite this, after carefully reviewing the record, we conclude that there is ample evidence in the record to support the court's ultimate determination that R.D.'s best interests are served by appointing Shirley, rather than Jacquelynn, as guardian of R.D.'s person and estate.

¶ 57　We now turn to Jacquelynn's second claim of error where she argues that the circuit court's award of only six hours of visitation was inadequate and against the manifest weight of the evidence. We disagree.

¶ 58　Section 602.9 of the Marriage Act (750 ILCS 5/602.9 (West 2018)) is titled "Visitation by certain non-parents" and describes the circumstances in which certain non-parents may petition the circuit court for court-ordered visitation time. Section 602.9 provides, with several enumerated exclusions, that a sibling of a minor child, "either of the whole blood or the half blood" (750 ILCS 5/602.9(a)(2) (West 2018)), may file a petition in the circuit court requesting visitation with the child. The following factors shall be considered by the court in determining whether to grant visitation:

"(A) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to visitation;

(B) the mental and physical health of the child;

(C) the mental and physical health of the grandparent, great-grandparent, sibling, or step-parent;

21

(D) the length and quality of the prior relationship between the child and the grandparent, great-grandparent, sibling, or step-parent;

(E) the good faith of the party in filing the petition;

(F) the good faith of the person denying visitation;

(G) the quantity of the visitation time requested and the potential adverse impact that visitation would have on the child's customary activities;

(H) any other fact that establishes that the loss of the relationship between the petitioner and the child is likely to unduly harm the child's mental, physical, or emotional health; and

(I) whether visitation can be structured in a way to minimize the child's exposure to conflicts between the adults." 750 ILCS 5/602.9(b)(5)(A)-(I) (West 2018).

¶ 59    Here, the circuit court's visitation schedule was supported by the evidence presented at the hearing. Shirley testified that she was concerned for R.D.'s emotional well-being if both Kristina and Jacquelynn were allowed visitation with R.D. Shirley testified that R.D. needed stability, given she had PTSD and had frequently moved between multiple homes in the past. In addition, Shirley testified that R.D. and Jacquelynn had not spent time together since Shirley was appointment as R.D.'s guardian on December 17, 2019, and Kristina's testimony indicating that R.D. was dirty, unkempt, and had been burned while in Jacquelynn's care was concerning. Thus, the court's decision to award Jacquelynn limited visitation was reasonable under the circumstances presented in this case.

¶ 60    As a final point, we briefly comment on the unusual procedural history of this case. While not the subject of this appeal, we are troubled by the *pro se ex parte* petition for emergency care and temporary custody/guardianship and a *pro se* petition for appointment of

22

guardian of the person of R.D. filed by Jacquelynn and Ricardo Jr. The *ex parte* petition includes allegations that R.D. was without a legal guardian and *in imminent danger*. The circuit court then appointed Jacquelynn as "temporary" guardian and set the matter for a hearing on the issue of "plenary" guardianship. However, the terms "temporary" and "plenary," as employed by the court, are typically used in the context of orders of protection, rather than in guardianship proceedings brought under the Probate Act. *In re Estate of H.B.*, 2012 IL App (3d) 120475 ¶¶ 28-29. Where, as here, the circumstances at issue involve a dependent minor (a minor who is without a parent, guardian, or legal custodian), or a minor who is at risk of harm due to an environment injurious to his or her welfare, the court should follow the provisions set forth in the Juvenile Court Act, not the Probate Act. The Probate Act simply was not designed to address such urgent matters. See *In re Estate of H.B.*, 2012 IL App (3d) 120475, ¶ 31 (finding that the Probate Act does not have a procedure similar to an emergency shelter care hearing as provided under the Juvenile Court Act).

¶ 61    We are also troubled by the circuit court's order striking Jacquelynn's pleadings and terminating her guardianship based on Shirley's motion for sanctions. In doing so, the court disrupted the minor's 13-month placement purely as a sanction, which was a remedy Shirley did not request. Although Kristina consented to Shirley's temporary guardianship appointment, the record, up to that point, is devoid of any findings that the best interests of the minor would be served by disrupting her previous placement, placing her in Shirley's temporary care and awarding Kristina parenting time. Moreover, Shirley did not request the termination of Jacquelynn's temporary guardianship as a sanction, and there is no indication that Jacquelynn deliberately missed the hearing or that Jacquelynn was made aware of the possibility of her removal as guardian.

23

¶ 62 With that being said, the circuit court's ultimate determination that R.D.'s best interests are served by appointing Shirley, rather than Jacquelynn, as guardian of R.D.'s person and estate, is amply supported by the record. In addition, as explained above, the court's decision to award Jacquelynn limited visitation with R.D. is reasonable considering the totality of the circumstances presented in this case.

¶ 63                                      III. Conclusion

¶ 64 For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.


¶ 65 Affirmed.